# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
March 7, 2025

Lyle W. Cayce
Clerk

No. 22-20588

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

CLARENCE C. ROLAND, III,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:18-CR-710-1

_____

Before JONES and OLDHAM, *Circuit Judges*, and HENDRIX, *District Judge*.[*]

JAMES WESLEY HENDRIX, *District Judge*:

After a nine-day trial during which Clarence Roland represented himself, a jury convicted Roland of several financial crimes stemming from his real-estate fraud scheme. Roland asserts that the district court plainly erred by admitting evidence of his and his co-conspirator's prior convictions and that the court abused its discretion by limiting his good-faith defense and

_____

[*] United States District Judge for the Northern District of Texas, sitting by designation.

denying his request for expert-witness funding. Roland further argues, without authority, that his conduct was not criminal. Finally, Roland correctly challenges a clerical error regarding the special assessment. We MODIFY the judgment to correct the clerical error and AFFIRM Roland's conviction in all other respects.

## I.

From 2009 to 2015, Roland initiated and participated in a scheme to defraud mortgage lenders and title insurance companies through unsuspecting victims who had difficulty making their home mortgage payments or were in foreclosure. To do so, Roland created a web of aliases, fake businesses, and fraudulent documents. He approached mortgage holders with the promise that he could help them "obtain their home free and clear of a mortgage" or "slow or stop their foreclosure." Roland claimed he had a legitimate, four-step process to do so. In reality, Roland would transfer ownership of the residential property to one of his shell entities, create a fake mortgage and lien on the property, and in the process eliminate the actual mortgage and security interest of an institutional lender through fraudulent filings in the county records. He would then sell the property to an unknowing third party and receive compensation for his shell entity's "mortgage" from the buyer.

To create the false appearance of a legitimate deed transaction to one of Roland's entities, he created warranty deeds and deeds of trust and filed them in county records. Like most residential properties, the targeted homes had a pre-existing mortgage from an institutional lender. Roland purported to eliminate any security interest that a legitimate mortgage lender held in the property by omitting the actual lender's interest in the property in the fraudulent deeds. The documents instead represented that "InterBank Loan Servicing Corp," one of Roland's fraudulent entities, had a mortgage lien on

the property. As a result, it appeared as though Roland's InterBank now held the only interest in the property.

Of course, there was no legitimate "InterBank" providing mortgages to residential properties, and the institutional lenders never forfeited their interest in the properties. Roland fabricated the documents necessary to create the appearance of this activity. He created fake deeds with fraudulent signatures and fraudulent notary stamps. The notary stamps were legitimate but obtained by filing false notary applications with the state of Texas using stolen identities.

After representing in the county records that the fraudulent entity held the only mortgage lien on the property, Roland would cause the real property to be sold. When real property is sold, title companies often assist sellers and buyers in the transaction. In this case, title companies were responsible for disbursing the funds involved in the transactions and paying lienholders and sellers their amount due from the buyers' funds. Due to Roland's scheme, the title companies received false information and fake mortgages. The title companies would then pay off what they thought was "InterBank's" legitimate security interest in the property. Roland would also receive a portion of the proceeds from the sales in the form of seller's funds.

Roland's scheme caught up to him. A jury convicted him of one count of conspiracy to commit wire fraud, three counts of wire fraud, and six counts of engaging in a monetary transaction over $10,000 in property derived from unlawful activity. The district court sentenced him to ten years' imprisonment. Additionally, the court imposed restitution of $3,251,897.41, ordered that Roland forfeit $1,984,642.09 to the United States, and ordered a special assessment of $1,000 in its written judgment.

No. 22-20588

## II.

Roland raises multiple issues on appeal. We review preserved evidentiary challenges for abuse of discretion. *United States v. Capistrano*, 74 F.4th 756, 779 (5th Cir. 2023). Unpreserved challenges are reviewed for plain error. *Id.*

To establish plain error, Roland must show that the district court erred and that the error was clear or obvious, rather than subject to reasonable dispute. *United States v. Jones*, 935 F.3d 266, 271 (5th Cir. 2019). Additionally, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the district court proceedings. *Id.* Finally, the court must decide in its discretion to correct the error because it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*

A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence. *United States v. Jackson*, 636 F.3d 687, 692 (5th Cir. 2011). We review a trial court's evidentiary rulings for abuse of discretion, subject to harmless error review. *Id.* An error is harmless if it did not affect the outcome of the district court proceedings. *United States v. Pineiro*, 410 F.3d 282, 285 (5th Cir. 2005). The government bears the burden of showing that the error was harmless beyond a reasonable doubt. *Id.*

## III.

Roland raises six issues on appeal. The first four relate to the district court's evidentiary rulings during trial. He additionally argues, without legal support, that his conduct was not criminal. Finally, Roland correctly highlights a clerical error regarding the special assessment. Other than the clerical error, which the government does not dispute, Roland fails to establish any reversible error.

No. 22-20588

A.

First, Roland argues that the district court improperly admitted evidence of his co-conspirator Arlando Jacobs's prior conviction, which resulted from the same fraudulent scheme. The government mentioned Jacobs throughout the trial as a co-conspirator, and Jacobs testified. By our count, the parties mentioned Jacobs's guilt seven times: during the government's opening argument, twice during the government's direct examination of Jacobs and once during its direct examination of FBI Special Agent Hanley, during the government's closing argument, during Roland's cross examination of Agent Hanley, and during Roland's closing argument. The district court offered two limiting instructions—one immediately before Jacobs's testimony and one during the final jury instructions. Prior to Jacobs's testimony, the court informed the jury that "[t]he fact that an accomplice has entered into a plea of guilty to the offense charged is not evidence of the guilt of any other person." Then, during the court's final instructions, it informed the jury that "[Jacobs's conviction] has been brought to your attention only because you may wish to consider it when you decide whether you believe the witness's testimony. It is not evidence of anything else."

Because Roland challenges the admission of evidence of Jacobs's conviction for the first time on appeal, we review his challenge for plain error. *See United States v. Leach*, 918 F.2d 464, 467 (5th Cir. 1990). We consider four factors when evaluating whether a court erred in admitting evidence of a co-conspirator witness's conviction: (1) the presence or absence of a limiting instruction; (2) whether there was a proper evidentiary purpose for introduction of the plea; (3) whether the plea was improperly emphasized or used as substantive evidence of guilt; and (4) whether defense counsel invited the plea's introduction into evidence. *United States v. Moparty*, 11 F.4th 280,

292 (5th Cir. 2021); *United States v. Delgado*, 401 F.3d 290, 300 (5th Cir. 2005).

Here, three of the four factors weigh against finding error. First, the jury received "a clear, cautionary instruction that it may consider the accomplice's guilty plea only to assess his credibility as a witness and not to create an inference of guilt against the accused." *United States v. Magee*, 821 F.2d 234, 241 (5th Cir. 1987) (citation omitted); *Moparty*, 11 F.4th at 292. And we presume that juries follow the district court's instructions. *Moparty*, 11 F.4th at 292.

Second, introduction of the guilty plea largely had a proper evidentiary purpose. During its opening argument, "[t]he government was entitled to outline for the jury its expected evidence[,] which included testimony by convicted co-conspirators." *Magee*, 821 F.2d at 241. Additionally, the government may "blunt the sword" of anticipated impeachment by revealing the information first, even if Roland "did not intend to impeach [Jacobs]." *United States v. Coleman*, 997 F.2d 1101, 1105 (5th Cir. 1993) (citation omitted). Mention of Jacobs's guilt during the government's direct examination falls into this category, because it related directly to his credibility.

In response, Roland asserts that the prosecution's strategy was improper because his strategy was not to impeach Jacobs. But to avoid the government's introduction of the plea during direct examination, Roland had to make an unequivocal commitment that it was not his strategy. *See United States v. Valley*, 928 F.2d 130, 134 (5th Cir. 1991). In an attempt to satisfy this standard, Roland mentions only a statement that he made in his closing argument, but that was, of course, too late.

To be sure, the government's mention of Jacobs's guilty plea during closing was an impermissible "guilt by association" argument. *See Leach*, 918 F.2d at 467. The prosecutor posed the rhetorical question: "[W]ho are

the co-conspirators that Roland worked with?" After listing other co-conspirators, he then mentioned "Arlando Jacobs . . . the man who has pled guilty to crimes just like these that he committed on his own . . . they were partners." *Id.* The prosecutor then recited the pair's criminal conduct. The prosecution is permitted to "outline for the jury" the evidence it adduced at trial—including a co-conspirator's testimony—during its closing argument. *Magee*, 821 F.3d at 241; *see also United States v. Holley*, 23 F.3d 902, 911 (5th Cir. 1994). But in this case, by closing arguments, there was no longer a need "to thwart a defensive strategy" or "negate expected impeachment efforts." *Moparty*, 11 F.4th at 292–93 (citation omitted). Instead, saying that Jacobs "pled guilty to crimes just like these" and that "they were partners," followed by a detailed description of the allegedly unlawful conduct committed by both Jacobs and Roland, could suggest that the illegality of the real-estate scheme "had already been decided." *United States v. Smith*, 930 F.2d 1081, 1089 (5th Cir. 1991). Therefore, this mention of Jacobs's guilt was not permissible.

Third, the guilty plea was not improperly emphasized or used as substantive evidence of guilt. With the possible exception of closing argument, "the prosecution did not linger on the fact that the witnesses had pled guilty, but it merely acknowledged the plea[]." *United States v. Jordan*, 945 F.3d 245, 258 (5th Cir. 2019). In general, Jacobs's plea itself was simply recognized as a fact, and the focus of the examination and argument quickly progressed.

Fourth, while defense counsel did not expressly invite introduction of the plea, this is not a necessary condition for the evidence to have been permissibly admitted. *See Delgado*, 401 F.3d at 300. And Roland did take "full advantage of th[e] evidence" to impeach Jacobs's credibility during his closing argument and call into question Agent Hanley's understanding of the real-estate market during cross examination. *Id.*

In sum, only the second of the four factors weighs in favor of finding error, and only as to one mention of the guilty plea. The first factor weighs against finding error because there was a strong curative instruction. The third and fourth factors also weigh against finding error, although not as strongly as the first. On balance, Roland falls well short of showing, as he must, clear and obvious error.

In any event, "[a] prejudicial remark may be rendered harmless by curative instructions to the jury." *United States v. Nickerson*, 669 F.2d 1016, 1020 (5th Cir. Unit B 1982). "The almost invariable assumption is that jurors follow [limiting] instructions." *Moparty*, 11 F.4th at 292 (internal quotation marks and citation omitted). "To overcome this presumption, there must be an overwhelming probability that the jury will be unable to follow the court's instruction . . . and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Id.* (internal quotation marks and citation omitted). We see no indication of that here.

Moreover, the mountain of evidence otherwise incriminating Roland belies any notion that mention of Jacobs's guilt "affected the outcome of the district court proceedings." *Jones*, 935 F.3d at 271 (citation omitted). The government presented overwhelming evidence of Roland's knowingly fraudulent activity. Jacobs provided significant and detailed testimony regarding the fraudulent nature of Roland's scheme: the filing of deceptive title documents using aliases, the receipt of payments through InterBank's false mortgages, and the use of fraudulent notary stamps. Two FBI agents testified that Roland admitted to filing fraudulent documents. Homeowners testified about their issues with purchased property due to Roland's scheme. Testimony confirmed that the notary stamps were fraudulently obtained. And the government offered voluminous evidence of the many fraudulent documents filed by Roland. Given the overwhelming evidence of guilt, even

if there were an error, it did not affect Roland's substantial rights or the outcome of the proceeding.

Despite Roland's argument otherwise, our opinion in *United States v. Miranda*, 593 F.2d 590 (5th Cir. 1979), is not to the contrary. In *Miranda*, the government's introduction of a testifying co-defendant's guilty plea constituted plain error notwithstanding a limiting instruction because the prosecutor "improperly urge[d] the jury to consider [the co-conspirator's] convictions as proof of [the defendant's] complicity" based in part on evidence not in the record. *Id.* at 594. The prosecutor did more than simply expose the prior convictions. He "urged the jury" to consider the co-conspirator's "convictions by an earlier jury as substantive evidence upon which [the] jury should rely in reaching its verdict[.]" *Id.* at 595. No such argument occurred here. And unlike *Miranda*, where the "government's case could be charitably described as 'adequate' at best," the government's case here is undeniably strong. *Id.* at 596.

B.

Second, Roland argues that the government improperly admitted evidence of his own prior convictions at trial. Although the district court granted an unopposed motion in limine to prevent the government from referencing Roland's past criminal convictions without prior approval, Roland opened the door to permissible use of his convictions by discussing them during his opening statement. Additionally, the district court gave the jury limiting instructions about Roland's prior convictions on three occasions: during witness testimony, after Roland's cross examination, and in the final jury instructions. The government also stressed the narrow purpose for which Roland's prior convictions could be used in its closing argument. Still, Roland contends that the government improperly used his prior convictions during its cross examination of him and during its direct examination of a detective. We disagree.

The parties dispute the standard of review. Roland asserts that we should review for "a heightened abuse of discretion." The government contends that Roland waived his right to bring any challenge to the government's use of this evidence by opening the door during his opening statement. In turn, Roland claims any waiver could not extend to the government's impermissible use of the evidence.

We need not determine whether waiver applies because, at most, plain-error review applies, and Roland falls well short of that standard. Absent waiver, plain-error review is appropriate because Roland did not object when the district court determined that he opened the door to his convictions. "[W]ithout a contemporaneous objection, a standing motion in limine is insufficient to preserve a point of error." *United States v. Powell*, 732 F.3d 361, 378 n.16 (5th Cir. 2013).

For three reasons, the court did not err by permitting evidence and discussion of Roland's convictions, and it certainly did not plainly err. First, evidence of the California conviction was admissible as intrinsic evidence. *See* Fed R. Evid. 404(b); *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990). Roland was convicted in California for charges arising from real-estate transactions involving three San Diego properties. The indictment in this case cites—and the government raised at trial—evidence of two of those property transactions. The government also adduced evidence of much of the same underlying conduct as the California conviction, including the same fraudulent notary stamps. The conduct underlying the California conviction is thus not extrinsic evidence subject to Rule 404(b)—but is rather intrinsic evidence. *See Williams*, 900 F.2d at 825; *United States v. Watkins*, 591 F.3d 780, 784–85 (5th Cir. 2009). The conduct underlying the California conviction is one part of the broader scheme—in California and elsewhere—at issue in this case. As intrinsic evidence, reference to the California conviction was permissible. *See United States v.*

*Bush*, 944 F.3d 189, 192 & n.3 (4th Cir. 2019) (holding that evidence of a guilty plea in state court for criminal activity also underlying the federal conspiracy charges was admissible as intrinsic evidence).

Second, the evidence was admissible to impeach Roland pursuant to Federal Rule of Evidence 609(a)(2) because the crime involved dishonesty or false statements. Impeachment under Rule 609(a)(2) is generally "limited to the number of convictions, the nature of the crimes and the dates and times of the convictions." *United States v. Gordon*, 780 F.2d 1165, 1176 (5th Cir. 1986). Here, the discussion of the California conviction was relatively brief, and the district court properly instructed the jury as to its limited purpose and applicability. *See United States v. Cihak*, 137 F.3d 252, 258 (5th Cir. 1998). This was not a case where a "substantial portion of the total volume of testimony before the jury concerned extrinsic offenses." *United States v. Peterson*, 244 F.3d 385, 393 (5th Cir. 2001) (citation omitted). The trial lasted nine days with significant witness testimony and several voluminous exhibits. The evidence addressing the prior conviction constituted, at most, a few sentences. Therefore, the admission of the California conviction was not an abuse of discretion, let alone plain error. *See id.*; *see also Cihak*, 137 F.3d at 258.

Finally, as with the first issue, given plain-error review, the mountain of evidence otherwise incriminating Roland belies any notion that mention of his California conviction "affected the outcome of the district court proceedings." *Jones*, 935 F.3d at 271.

C.

Third, Roland argues that the district court improperly restricted his good-faith defense because the court limited his ability to do three things: (1) to "fully explain his understanding of the legality of his four-step process;" (2) to question witnesses, including Jacobs; and (3) to elicit evidence about Roland's reputation for honesty. We review this preserved

evidentiary issue for abuse of discretion. *Jackson*, 636 F.3d at 692 (citation omitted). The district court's first two limitations were not an abuse of discretion, and the third limitation was harmless error.

First, the district court appropriately limited Roland's ability to advance his good-faith defense—specifically with respect to his claimed reliance on *Jesinoski v. Countrywide Home Loans, Inc.*, 574 U.S. 259 (2015), and 15 U.S.C. § 1635. Section 1635 creates a right of rescission for obligors in a narrow set of consumer-credit transactions where a security interest is created. 15 U.S.C. § 1635(a). Roland believes that Section 1635's limited right of rescission and *Jesinoski's* interpretation of Section 1635 allowed him to commit his fraudulent scheme.

"The trial court is afforded wide discretion in assessing the relevance and prejudicial effect of evidence." *United States v. Seale*, 600 F.3d 473, 494 (5th Cir. 2010) (citation omitted). Here, the record shows that the court provided Roland substantial latitude during his pro se representation. Roland testified extensively regarding his alleged good-faith defense. Indeed, the district court permitted Roland to testify regarding Section 1635 and his personal beliefs, allowed the statute to be published to the jury, and let Roland cross examine government witnesses, including Jacobs, about the statute and scheme.

Notwithstanding the wide berth given to Roland to press his good-faith defense, the district court deemed the Supreme Court decision irrelevant and potentially prejudicial. For good reason. *Jesinoski's* holding establishes that a consumer borrower exercises his right of rescission on a loan under Section 1635 by providing written notice to his lender within three years. 574 U.S. at 262. The district court did not abuse its discretion when it did not permit *Jesinoski*—a January 2015 opinion about the timing requirements of Section 1635—to be admitted as evidence with respect to Roland's alleged conspiracy, which began in 2009 and ended in April 2015.

Given its holding and timing, the case was irrelevant to Roland's good-faith defense. Neither *Jesinoski*, Section 1635, nor anything else permitted Roland to use fake names and notaries in the real-property records so he could sell property that he did not own. Finally, introduction of unrelated case law posed a significant threat of misleading and confusing the jury. *See* Fed. R. Evid. 403.

Second, the district court did not impermissibly limit Roland's ability to question witnesses. Roland challenges the court's exclusion of four questions. The court sustained an objection when Roland asked Jacobs: "[I]f the recission was affected and it really worked, so to speak, would you have the right to [use fake notary stamps and signatures?]" The court also sustained objections to two questions to a title employee of Fannie Mae: (1) "[I]f a homeowner had legally rescinded the transaction, would all the documents that followed that rescission . . . be legal?"; and (2) "[I]f it had been legally rescinded, would [Fannie Mae] have been able to quiet the title and still have a claim on that property?" Finally, the court sustained an objection to a question to a title-company employee: "[H]ad th[e] loan been rescinded properly . . . would all the documents . . . be legal?"

The district court permissibly curtailed the form of Roland's questioning of lay witnesses and did not curtail the general subject matter of his questioning. Each question asked the witness to answer a hypothetical question. But a "witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. Roland offered no evidence to suggest the witnesses had any personal knowledge of whether, following mortgage rescission, using fake notary stamps and fraudulent signatures on property documents is lawful. Additionally, the line of questioning attempted to elicit impermissible lay-witness opinions on his scheme's

legality. *See* Fed. R. Evid. 701. The district court did not forestall Roland's good-faith defense, only his impermissible line of questioning.

Third, the limitation on Roland's ability to elicit character evidence about his reputation for honesty was harmless. The court did not permit Roland to question his ex-wife regarding a pertinent character trait. Roland asked, "to your knowledge, am I considered an honest businessperson or—in your opinion?" The district court should have allowed this line of questioning pursuant to Rule 404(a)(2)(A), which permits a defendant in a criminal case to offer evidence of the defendant's pertinent character trait. Fed R. Evid. 404(a)(2)(A). This error of law was an abuse of discretion. *See United States v. De Leon*, 728 F.3d 500, 505 (5th Cir. 2013) (holding that the district court abused its discretion when it excluded evidence of the defendant's law-abiding character).

But we "will not overturn a conviction based on the exclusion of evidence unless a reasonable probability exists that the error contributed to the conviction." *Id.* (citation omitted). Here, while Roland's good-faith defense was undoubtedly a key component of his trial strategy, "the government presented overwhelming evidence" of Roland's knowingly fraudulent activity. *Id.* at 506. "In light of all that evidence, there is no meaningful probability that the jury would have acquitted [Roland], even if it had heard his" ex-wife testify that he was an honest businessman. *Id.* Given the overwhelming evidence of guilt, Roland was not prejudiced by the district court's error.

## D.

Fourth, Roland argues that the district court abused its discretion by denying his request for expert-witness funding for "title expert" Steven Knoblock. *See United States v. Hardin*, 437 F.3d 463, 468 (5th Cir. 2006) (reviewing the district court's denial of a motion for expert appointment for abuse of discretion). Roland asserts that Knoblock would have testified that

Roland's use of title documents was consistent with industry practice in California and regarding the process of signing real-estate documents and substituting lienholders. Roland contends that the Criminal Justice Act mandates the funding of an independent expert witness when necessary to respond to the government's case. Roland asserts that the "title expert" was necessary here because testimony that his conduct accorded with industry practice "may have supported his good faith defense."

Roland's failure to make a formal motion or request under 18 U.S.C. § 3006A(e)(1) is fatal to his argument. *See United States v. Scott*, 48 F.3d 1389, 1395–96 (5th Cir. 1995). "The rights established by Section 3006A(e) are procedural, and the failure to make a timely motion or request waives the necessity for the court's consideration of an appointment of an expert witness." *Id.* (quoting *United States v. Patterson*, 438 F.2d 328, 329 (5th Cir. 1971)). Roland's only formal ex parte motion regarding Knoblock's testimony was made "pursuant to Federal Rule of Criminal Procedure 17." Roland "never referred to the statute, or to [his] financial ability to procure an expert," as required by Section 3006(A)(e)(1), in the motion or in the subsequent ex parte hearings with the court. *Scott*, 48 F.3d at 1396. Roland's "failure to make a formal [Section] 3006A(e) motion or request thus relieved the district court of any responsibility to authorize the expenditure of government funds on a[n] . . . expert." *See id.*

Even assuming Roland did not waive his opportunity to seek expert testimony, his requests fell short of Section 3006A(e)(1)'s specificity requirement. A district court "shall authorize" an indigent defendant to receive court-funded expert testimony if it finds, "after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them." 18 U.S.C. § 3006A(e)(1). To establish the requisite necessity, the burden is on the defendant to "demonstrate with *specificity*[] the reasons why such services are required." *United States v.*

*Gadison*, 8 F.3d 186, 191 (5th Cir. 1993) (citation omitted) (emphasis in original).

Ignoring these requirements, Roland never "demonstrate[d] with specificity[] the reasons why such services are required." *See id.* Roland did not explain the legal or factual theory that Knoblock's testimony would help advance. Only in his appellate briefing does he suggest that Knoblock might have assisted his good-faith defense. But we review the motion "in light of only the information available to the trial court at the time it acted on the motion." *Hardin*, 437 F.3d at 468 (quotation marks and citation omitted). Roland did not "specifically identify[] . . . the disputed issue" beyond broad references to testimony regarding California real-estate practices. *See id.* at 470. Indeed, Roland never responded to the district court's repeated request for additional information explaining why Knoblock's testimony was necessary.

Finally, given the independent evidence of patently fraudulent notary stamps and signatures, which served as the fundamental basis for Roland's conviction, expert testimony regarding presumably lawful California real-estate practices "would not have significantly assisted in the defense." *See United States v. Walborn*, 730 F.2d 192, 194 (5th Cir. 1984). Therefore, Roland's failure to make a formal Section 3006A(e)(1) request constitutes waiver, and, even if he had made a proper request, the court did not abuse its discretion by denying it.

## E.

Fifth, Roland argues that his conduct was not criminal because 15 U.S.C. § 1635 authorized his "four-step process." But his counsel admits that he "has found no authority that authorizes the filing of documents with false notary stamps to change title to a property." And for good reason— there is none. Under any standard of review, the argument is meritless.

Section 1635 is entirely inapplicable to this case. It expressly exempts "a residential mortgage transaction" like those at issue here. 15 U.S.C. § 1635(e)(1). Roland's criminal conduct stems from his fraudulent scheme—using fake names and notaries, filing falsified property records, and purporting to sell properties he did not own—not his hypothetical "four-step plan" pursuant to Section 1635. There was ample evidence regarding the criminality of Roland's actions, including his creation of fake companies, fake title documents, and fake notaries, which resulted in losses to title companies of over $2.7 million.

Moreover, Roland does not make even a passing attempt at showing that there was insufficient evidence for the jury to convict him for (1) conspiracy to commit fraud, (2) wire fraud, and (3) engaging in a monetary transaction over $10,000 in property derived from unlawful activity. *See United States v. Yusuf*, 57 F.4th 440, 444–45 (5th Cir. 2023); *see also United States v. Martinez*, 263 F.3d 436, 438 (5th Cir. 2001) ("[A] defendant waives an issue if he fails to adequately brief it."). Roland's conduct was criminal, and his argument to the contrary is meritless.

F.

Sixth, and finally, Roland correctly notes that there is a clerical error in the written judgment. The judgment states that Roland owes the entirety of the $100 special assessment for each of his ten counts of conviction despite the district court orally granting the government's motion at sentencing to waive the $100 special assessment for each count. When a court's oral pronouncement conflicts with the written judgment, the oral pronouncement controls. *United States v. Diggles*, 957 F.3d 551, 557 (5th Cir. 2020) (en banc). Rather than remand to the district court for the limited purpose of correcting a clerical error, we MODIFY the district court's written judgment to waive the $1,000 special-assessment obligation in accord with the court's oral pronouncement. *See United States v. Naidoo*, 995 F.3d 367, 382 (5th Cir.

2021) (modifying the judgment and changing the special-assessment amount without remanding to the district court); *United States v. Boston*, 186 F. App'x 504, 507 (5th Cir. 2006) ("We, therefore, adjust the special assessment to $100 and do not remand.").

## IV.

We AFFIRM Roland's conviction in all respects, except for the clerical error regarding the special assessment. The admission of evidence related to Jacobs's and Roland's convictions was not plain error. The alleged restrictions of Roland's good-faith defense were either not an abuse of discretion or were harmless. The denial of Roland's informal request for expert-witness funding likewise was not an abuse of discretion. And Roland's conduct was unquestionably criminal. Therefore, we MODIFY the district court's written judgment to remove the special assessment, and, in all other respects, we AFFIRM.